# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | CRIMINAL NO. 1:18-CR-171 |
| | : | |
| v. | : | (Chief Judge Conner) |
| | : | |
| **BRANDON ORR (2),** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Defendant Brandon Orr ("Orr") moves the court to suppress evidence and statements resulting from his arrest on September 28, 2017. (Doc. 84). The court will deny Orr's motion.

## I. Findings of Fact[1]

Detective Russell Schauer ("Detective Schauer") is employed by the Springettsbury Township Police Department in York County, Pennsylvania, and has served on the York County Drug Task Force since 2008. (Tr. 4:8-5:3). On December 5, 2017, a confidential informant advised Detective Schauer that the informant could purchase ten grams of heroin from Orr.[2] (Id. at 5:11-16; Gov't Ex. 4 at 5). The confidential informant placed an initial, mid-morning phone call to Orr, who indicated he would not be available until around 2:30 p.m. (Tr. 5:20-24, 19:9-19; Gov't Ex. 4 at 5). Using the confidential informant's cell phone, Detective Schauer

---

[1] The above factual narrative derives from testimonial evidence adduced during the suppression hearing convened on July 19, 2019. Citations to the transcript of that hearing are abbreviated as "Tr." Citations to hearing exhibits are abbreviated as "Gov't Ex." or "Def. Ex."

[2] The confidential informant was initially detained by law enforcement and then offered to arrange the purchase of heroin from Orr. (Id. at 5:11-17, 19:5-11).

texted Orr shortly before 2:30 p.m. and set up a meeting at a local ice cream shop. (Tr. 5:25-6:18; Gov't Ex. 4 at 5). Orr agreed to sell ten grams of heroin to Detective Schauer for $700. (Tr. 6:14-20; Gov't Ex. 4 at 5).

### A. Orr's Arrest

Detective Schauer assembled an arrest team of five other officers who took up surveillance positions around the ice cream shop parking lot. (Tr. 6:21-7:5, 21:14-22:4; Gov't Ex. 1 at 1). Orr arrived in the parking lot driving a black Ford Fusion around 2:25 p.m. (Tr. 7:6-9, 52:2-11; Gov't Ex. 4 at 5). Officer Michelle Hoover ("Officer Hoover") walked past the driver's side door in plain clothes, positively identified Orr as the driver, and signaled the arrest team to move in. (Tr. 7:9-14; Gov't Ex. 4 at 5). Detective Schauer pulled in front of the Ford Fusion, and Officer Adam Bruckhart ("Officer Bruckhart") maneuvered his vehicle to block Orr in from behind. (Tr. 52:21-22, 53:8-15, 54:12-14, 80:1-2; see Gov't Ex. 4 at 5). Officer Bruckhart arrested Orr at approximately 2:30 p.m. (Tr. 7:15-16, 31:16-24, 53:5-6; Gov't Ex. 1 at 1; Gov't Ex. 4 at 5). The officers found a cell phone on Orr's person and a bag of heroin on the floor of the Ford Fusion near the driver's seat. (Tr. 7:17-20, 8:1-5; Gov't Ex. 4 at 5). Detective Schauer later confirmed that the recovered cell phone was the same phone that he and the confidential informant had called and text messaged earlier in the day. (Tr. 7:21-25; Gov't Ex. 4 at 5).

### B. Orr's Cooperation

Detective Schauer placed Orr in the front passenger seat of his police vehicle and provided him with verbal Miranda warnings. (Tr. 8:9-9:5, 20:18-21:7, 22:11-14, 31:25-32:3; Gov't Ex. 4 at 5). Detective Schauer made no promises to Orr in

2

exchange for waiving his Miranda rights or consent to search his home. (Tr. 37:18-23). Orr agreed to answer Detective Schauer's questions but initially denied having anything illegal at his home. (Id. at 9:6-21). Detective Schauer explained that officers had followed Orr from his house and that they would be obtaining a search warrant for the residence. (Id. at 9:21-23, 58:11-23; Gov't Ex. 4 at 5). Orr then admitted that there was a bookbag just inside the front door of the home containing drugs. (Tr. 9:23-24, 10:7-13; Gov't Ex. 4 at 5). Orr explained that he received the drugs from Luis Minier ("Minier"). (Tr. 9:24-10:6; Gov't Ex. 4 at 5). Orr asked Detective Schauer not to charge his girlfriend, Shanique Johnson ("Johnson"), who was at the home and had met with Minier earlier that day to obtain the bookbag.[3] (See Tr. 9:24-10:6, 11:12-14; Gov't Ex. 4 at 5).

Detective Schauer drove Orr to the Drug Task Force office where Orr was asked to sign a consent-to-search form for his residence. (Tr. 10:14-25, 61:20-62:4). Orr had the opportunity to read the consent-to-search form, and Detective Schauer testified that he read Orr the following paragraph before Orr signed it:

> I, Brandon Orr have been requested by Detective
> Schauer of the York County Drug Task Force to give my
> consent for police to search Place(s), item(s), or vehicle(s)
> described above for the items described above. I have

---

[3] Orr testified that neither Detective Schauer nor any other officer ever provided him with Miranda warnings. (Tr. 56:18-57:16). According to Orr, Detective Schauer immediately began asking him for information and Orr demanded to be taken to central booking. (See id. at 55:22-56:7, 56:18-57:3). Orr recalled receiving Miranda warnings the previous five times he had been arrested. (Id. at 70:21-23, 71:5-72:3). Orr also testified that he understood the Miranda rights provided to him during previous arrests and that he had never before waived those rights or given a statement to police. (Id. at 72:19-73:14). He acknowledged that he knew anything he said to law enforcement could be used against him. (Id. at 73:5-11).

3

> been told that I do not have to give my consent. I
> understand that I have the right to refuse this request,
> and that the police may not be able to conduct this search
> without a search warrant unless I give my consent.
> Nonetheless, I voluntarily give my consent to the police to
> conduct this search.

(Tr. 33:24-34:21; Gov't Ex. 2). The consent-to-search form further stated that no one had threatened or promised anything to Orr in exchange for his consent. (Gov't Ex. 2). Orr claimed that he never read the form and that Detective Schauer never read the above-quoted paragraph out loud to him. (Tr. 78:8-16). As set forth below, the court finds the law enforcement officers (Detective Schauer and Trooper Wolfe) who testified at the suppression hearing to be credible; conversely, the court does not find Orr's statements or claims to be credible.

Officer Hoover and Detective Schauer witnessed Orr sign the consent-to-search form at approximately 3:10 p.m. (Gov't Ex. 2; Tr. 32:20-33:5,). Detective Schauer did not recall if the form was signed at the Drug Task Force office or in front of Orr's residence moments before the search. (Tr. 16:22-17:6). After Orr read and signed the consent form, Detective Schauer and Officer Hoover drove Orr to his residence.[4] (Id. at 11:1-5, 33:21-23, 34:19-21, 62:21-24; Gov't Ex. 2; Gov't Ex. 4 at 5). Detective Schauer testified that the purpose of bringing Orr along was twofold: (1)

---

[4] Orr testified that, before he signed the consent-to-search form, Detective Schauer told him that the police were "getting a search team ready to [] execute a search warrant" and that officers would kick in the door of his home and traumatize the children. (Tr. 59:16-60:2, 60:15-22, 67:24-68:3). He then clarified that Detective Schauer said that police "already had a search warrant and that he was assembling the search team." (Id. at 60:9-14). According to Orr, Detective Schauer promised Orr that he would be released if he provided information on the source of the drugs in the bookbag, which is why he agreed to cooperate. (Id. at 60:23-61:3, 62:10-20, 67:24-68:3, 86:18-87:25).

4

Orr agreed to let officers into the residence, and (2) Orr would encourage Johnson to avoid any conduct that might alert Minier that Orr was cooperating with law enforcement. (Tr. 11:6-24). Immediately upon entering the residence, Orr identified a bookbag on the floor. (Id. at 11:25-12:2; Gov't Ex. 4 at 5). Detective Schauer opened the bookbag and discovered approximately one kilogram of cocaine and a gallon-sized bag of heroin. (Tr. 12:2-5; Gov't Ex. 4 at 5). Orr then asked Johnson to refrain from publicizing that he had been arrested or that the police had been at their home. (Tr. 12:6-20; Gov't Ex. 4 at 5). Detective Schauer and Orr returned to the Drug Task Force office, and Johnson was permitted to remain in the home. (Tr. 12:22-25; Gov't Ex. 4 at 5).

Law enforcement decided to obtain a search warrant for Minier's residence based on the information provided by Orr including Orr's recent observation of $20,000 in drug proceeds when visiting Minier's residence. (Tr. 13:7-11, 15:6-9; see Gov't Ex. 1 at 2-3; Gov't Ex. 3 at 2). Around 4 p.m., Detective Schauer contacted Pennsylvania State Police Trooper Shawn Wolfe ("Trooper Wolfe") regarding the investigation of Minier. (Tr. 40:17-24, 46:15-20). Trooper Wolfe has been a Pennsylvania State trooper since 2003 and was a member of the York County Drug Task Force from 2007 to 2018. (Id. at 41:2-13). He is also detailed to the Federal Bureau of Investigation's Safe Streets Task Force in Harrisburg, Pennsylvania. (Id. at 40:25-41:1).

Trooper Wolf drove Orr to identify Minier's residence for the search warrant that Detective Schauer was preparing. (Id. at 13:12-17, 42:16-43:7, 43:13-16). When Orr entered Trooper Wolfe's vehicle around 5 p.m., Trooper Wolfe identified

5

himself as law enforcement and provided Orr with verbal Miranda warnings before asking any questions "to make sure that there was no confusion as to why [he] was there as part of [the] investigation." (Id. at 43:17-44:6, 48:8-16, 48:25-49:6, 49:16-22, 50:15-21). Orr testified that Trooper Wolfe never read him his Miranda rights. (Id. at 65:6-8, 65:18-20). As Trooper Wolfe drove down Orr's street, Orr identified Minier's home by pointing out Minier's Chevy Impala and an inflatable Santa Claus on Minier's lawn. (Id. at 44:18-45:15, 65:9-17). After dropping Orr off at the Drug Task Force office, Trooper Wolfe returned to Minier's residence to conduct surveillance until the search warrant was signed. (Id. at 45:16-21). Trooper Wolfe testified that the entire trip to and from Minier's residence took about 15 to 20 minutes and that Orr was friendly, conversational, and cooperative. (Id. at 45:22-46:2, 50:10-22).

Detective Schauer placed Orr in a holding cell at the Drug Task Force office. (Id. at 14:5-8, 28:9-12). Orr stated that he was placed in a small room with a table and two chairs. (Id. at 83:19-84:9). He never requested food, drink, or a bathroom break. (Id. at 83:7-18). Detective Schauer reviewed with Orr all the information he had provided throughout their conversations and interactions that day, including his trip to Minier's residence with Trooper Wolfe. (Id. at 14:9-16). Detective Schauer memorialized this information in two handwritten pages of bulleted notes. (Id. at 14:13-16, 77:21-25; Gov't Ex. 1 at 2-3; Gov't Ex. 4 at 6). Orr signed his name at the bottom of each page. (Tr. 14:16-17, 77:16-20; Gov't Ex. 1 at 2-3; see Gov't Ex. 4 at 6). Orr testified that Detective Schauer wrote these interview notes before driving to Orr's home to retrieve the bookbag of drugs, (Tr. 61:4-16, 81:8-24), despite the fact

6

that the handwritten notes included a reference to Orr's trip with Trooper Wolfe to identify Minier's residence earlier in the day, (id. at 81:24-83:6, 85:22-86:12). Law enforcement executed a search warrant of Minier's residence at 7:15 p.m. (Id. at 14:18-24, 46:3-7; Gov't Ex. 4 at 6; see Gov't Ex. 3). Officers arrested Minier after discovering 28 grams of cocaine and more than $21,000 in the residence. (Tr. 14:25-15:9, 46:3-7; Gov't Ex. 4 at 6).

### C. Orr's Arrest Report

An application for a search warrant is accompanied by an affidavit of probable cause. (See, e.g., Gov't Ex. 3 at 2-3). When an officer prints an affidavit of probable cause, the system automatically generates an arrest report. (Tr. 25:6-10, 30:18-24; see, e.g., Def. Ex. 1). Detective Schauer acknowledged that Orr's arrest report was missing many details including the time of his arrest, whether Miranda warnings were provided, and the arresting officer's signature. (Tr. 25:1-5, 25:11-26:4, 27:1-7; see Def. Ex. 1). Orr testified that his date of birth and social security number were incorrect on the arrest report. (Tr. 68:17-69:2, 84:10-85:17; see Def. Ex. 1). Detective Schauer explained that he did not fill out the arrest report; rather, arrest reports "automatically generate[d]" based on information input elsewhere in the system. (See Tr. 26:5-25).

## II. Procedural History

A federal grand jury returned an indictment against Orr, Minier, and two others on May 23, 2018. The indictment charges Orr with conspiracy to distribute and possess with intent to distribute various controlled substances in violation of 21 U.S.C. § 846 and possession with intent to distribute multiple controlled substances

7

in violation of 21 U.S.C. § 841(a). Orr pled not guilty and moved to suppress all evidence found and statements made after his arrest. Following a suppression hearing on July 17, 2019, and briefing by the parties, the motion is ripe for disposition.

### III. Discussion

Orr argues that the police failed to provide him with Miranda warnings, rendering his incriminating statements involuntary. Statements made by a suspect during custodial interrogation are admissible only if police apprised the suspect of his or her rights under Miranda v. Arizona, 384 U.S. 436 (1966), and the suspect chose to waive them knowingly and voluntarily. Miranda, 384 U.S. at 444, 475. A defendant may implicitly waive the right to remain silent by voluntarily speaking with police after receipt of Miranda warnings. See Berghuis v. Thompkins, 560 U.S. 370, 384-85 (2010). A statement is voluntary if "it is the product of an essentially free and unconstrained choice by its maker," United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994)), rather than the result of "intimidation, coercion, or deception," Berghuis, 560 U.S. at 382 (citation omitted). The government bears the burden of establishing by a preponderance of the evidence that a defendant's challenged statements were made voluntarily. Jacobs, 431 F.3d at 108 (citation omitted).

Orr also contends that his consent to search his residence was not freely or voluntarily given. Law enforcement may conduct a search in the absence of a warrant or probable cause if the questioned individual consents to the search.

United States v. Stabile, 633 F.3d 219, 230 (3d Cir. 2011) (quoting Schneckloth, 412 U.S. at 219). The government must prove that consent was "freely and voluntarily given" and not mere acquiescence to "a claim of lawful authority." United States v. Price, 558 F.3d 270, 277-78 (3d Cir. 2009) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983); Bumper v. North Carolina, 391 U.S. 543, 548 (1968)).

Several factors are germane to the voluntariness of both waiver and consent: the individual's age, education, and intelligence; whether law enforcement advised the individual of his or her constitutional rights; the length and setting of the encounter; the frequency and duration of the questioning; the parties' verbal and nonverbal conduct; and any use of physical punishment. See Price, 558 F.3d at 278 (citations omitted); Jacobs, 431 F.3d at 108; Swint, 15 F.3d at 289 (citations omitted). The court should also consider the defendant's "prior dealings with the criminal justice system . . . in the voluntariness inquiry" as it pertains to an alleged waiver of Miranda rights. Jacobs, 431 F.3d at 108.

The record clearly establishes that Orr understood and voluntarily waived his Miranda rights. Orr claims that he never received Miranda warnings after being taken into custody on December 5, 2017. (Doc. 85 at 3-4; Tr. 56:18-57:16, 65:6-8, 65:18-20). However, both Detective Schauer and Trooper Wolfe testified that Orr was given two Miranda warnings: first after his arrest and placement in Detective Schauer's vehicle, (Tr. 8:9-9:5, 20:18-23, 22:11-14, 31:25-32:3; see also Gov't Ex. 4 at 5), and again prior to departing for Minier's residence with Trooper Wolfe, (Tr. 43:17-44:6, 48:8-16, 49:16-22, 50:15-21). We credit both officers' testimony based on our observations of their demeanor and the consistency of their accounts

9

throughout the evidentiary hearing. We therefore find that Orr received <u>Miranda</u> warnings.

We further find that Orr understood and voluntarily waived his <u>Miranda</u> rights. Orr had been arrested at least five times before being taken into custody by Detective Schauer. (<u>Id.</u> at 70:21-23, 71:5-6). He testified that he understood the <u>Miranda</u> rights provided to him on each of those prior arrest occasions and that he had never before waived those rights or given a statement to police. (<u>Id.</u> at 71:16-72:3, 72:19-73:14). And there is no dispute that Orr initially declined to cooperate with police in Detective Schauer's vehicle following his receipt of <u>Miranda</u> warnings, revealing that Orr was capable of exercising his rights. (<u>See id.</u> at 9:19-21, 55:22-56:7, 56:18-57:3).

Orr also claims that his consent to search was involuntarily because Detective Schauer (1) promised to release Orr if he cooperated and (2) indicated that police had a search warrant and, in the course of executing that warrant, would kick down Orr's door and traumatize the children in the home. (<u>Id.</u> at 59:16-60:2, 60:9-61:3, 62:10-20, 67:24-68:3, 86:18-87:25). We credit Detective Schauer's testimony that no promises were made to Orr in exchange for his consent. (<u>Id.</u> at 37:18-20). Orr signed a consent-to-search form containing a paragraph that stated he had been informed of his right to withhold consent and the requirement that the police obtain a search warrant in the absence of consent. (<u>Id.</u> at 33:24-34:18; Gov't Ex. 2). The form also stated that no one had threatened or promised anything to Orr in

exchange for his consent. (Gov't Ex. 2). We do not find Orr's version of events credible.[5]

Orr's prolonged cooperation with multiple officers over the course of several hours is probative of the voluntariness of his statements and consent. Orr agreed to disclose the full extent of his criminal activity, beginning with the admission that there was a bookbag containing drugs in his home. (Tr. 9:23-10:13; Gov't Ex. 4 at 5). After signing the consent-to-search form, Orr opened his home to the officers and proactively identified the bookbag. (Tr. 11:1-5, 11:25-12:2, 32:20-33:5, 61:20-62:4, 62:21-24; Gov't Ex. 2; Gov't Ex. 4 at 5). Orr recalled to officers that he and Johnson obtained the bookbag from Minier, that Orr obtained drugs from Minier's supply, and that Orr had observed approximately $20,000 in drug proceeds when visiting Minier's home earlier that day. (Tr. 9:23-10:6, 11:12-14, 15:6-9; Gov't Ex. 1 at 2-3; Gov't Ex. 3 at 2; Gov't Ex. 4 at 5). Orr then drove with Trooper Wolfe to identify Minier's residence for purposes of obtaining an accurate warrant to search the property. (Tr. 13:12-17, 44:18-45:15, 65:9-17). Trooper Wolfe testified that Orr was friendly, conversational, and cooperative throughout the entire trip. (Id. at 50:10-22).

---

[5] The physical evidence in the matter *sub judice* also calls into question the accuracy and credibility of Orr's recollection of events. For example, Orr testified that Detective Schauer wrote two pages of bulleted notes (which Orr signed) based on Orr's various admissions *before* he rode with Trooper Wolfe to identify Minier's residence, (Tr. 14:13-17, 77:21-25; Gov't Ex. 1 at 2-3; Gov't Ex. 4 at 6), yet the first page of these notes states that "[Orr] showed Trp. Wolfe [Minier's] house," (Gov't Ex. 1 at 2). When confronted with the fact that these notes must have been transcribed *after* his trip with Trooper Wolfe, Orr could not explain the disparity and stood by his original testimony. (Tr. 81:8-83:6, 85:22-86:12).

11

The balance of relevant factors supports the conclusion that Orr voluntarily waived his constitutional rights. The record is devoid of any evidence of coercion throughout the course of Orr's interactions with law enforcement on the day of his arrest. Orr did not testify that officers threatened him with physical harm or that he felt fearful while in their custody. He was never denied food, drink, or a bathroom break, nor held in unconscionable conditions. (See id. at 83:7-84:9). Based on the totality of the circumstances, as well as our credibility determinations, we conclude that Orr received Miranda warnings and that he knowingly and voluntarily waived his constitutional rights.

## IV. Conclusion

The court will deny Orr's motion (Doc. 84) to suppress evidence and statements. An appropriate order shall issue.

      /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:     August 15, 2019